**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482, *Admission Pending*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, individually and on behalf of all other persons similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> O POSITIV, INC., <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe 1 and Jane Doe 2 ("Plaintiffs") file this class action on behalf of themselves and all others similarly situated against Defendant, O Positiv, Inc., ("Defendant" or "O Positiv"). Plaintiffs bring this action based upon their personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents and individuals nationwide against O Positiv for breaching its customers' trust and allowing companies to invade its customers' privacy through its website, https://opositiv.com/ (the "Website"). In particular, O Positiv helped Meta, Inc., formerly Facebook, ("Meta"), Alphabet Inc. ("Google"), Wingify Software Pvt. Ltd. ("Wingify"), and Snap, Inc. ("SnapChat") (collectively the "Third Parties"), to collect and intercept customers' communications with O Positiv as consumers selected options from a drop-down menu provided on the Website and/or added particular items to their shopping carts to purchase.

2.    This case is about the protection of women's privacy in their personal, intimate information related to their reproductive and sexual health. O Positiv is a business that specializes in providing "OBGYN-recommended products designed to support [women] from [their] first period to well beyond [their] last" [1] including products related to vaginal and gut health, menstruation and hormones, and menopause and healthy aging[2]. Given the highly personal and sensitive nature of O Positiv's business, and the stigma surrounding menstruation[3] and menopause[4]

---

[1] O POSITIV, *About*, https://opositiv.com/pages/about-us.

[2] *See generally*, O POSITIV, *Shop All*, https://opositiv.com/collections/shop-all.

[3] Renske Mirjam van Lonkhuijzen; Franshelis Katerinee Garcia; Annemarie Wagemakers, *The Stigma Surrounding Menstruation: Attitudes and Practices Regarding Menstruation and Sexual Activity During Menstruation*, WOMEN'S REPRODUCTIVE HEALTH, VOL. 10 (SEP. 27, 2022), https://www.tandfonline.com/doi/full/10.1080/23293691.2022.2124041.

[4] Jill Rabin, MD, *Women Have Been Shamed and Stigmatized Over Menopause For Years*, NORTHWELL HEALTH, KATZ INSTITUTE FOR WOMEN'S HEALTH, https://www.northwell.edu/katz-institute-for-womens-health/articles/women-stigmatized-over-menopause.

(and other women's health issues[5]), consumer's personal and sensitive communications with the Website should be kept confidential.

3.      Accordingly, whichever premenstrual syndrome ("PMS") or menopause vitamin, vaginal moisture support capsule, or female sexual health product a person is looking to buy on Defendant's Website is no one else's business.  Except that Defendant made these sensitive facts the business of Meta, Google, Wingify, and SnapChat, given that O Positiv has allowed these Third Parties to snoop on shopper's confidential electronic communications through its Website.  Using tracking tools, O Positiv has enabled these Third Parties to intercept consumers' communications as they navigate Defendant's Website to browse for products to purchase by selecting the category of products to view from the Website's drop-down menu.  Because Defendant does not include a search bar on its Websites, consumes must use the Website's drop-down menu to browse for products.  This menu includes product categories like URO-Vaginal & Gut Health; FLO-Period & Hormones; MENO-Healthy Aging; and PREGGO-Nutrition & Support.  The menu categories are shared with the Third Parties as events and include key terms like "period," "vaginal" and "meno" for menopause, leading the Third Parties to obtain information about consumers' sensitive sexual and reproductive health.  All of this is being done to help Defendant with its marketing, advertising, and data analytics efforts and to increase Defendant's and the Third Parties' profits.

4.      The nature of the Third Parties' licensing agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, learn, and/or use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632.

5.      Plaintiffs bring this action individually, on behalf of a nationwide class, and on behalf of a subclass of all California residents who browsed for products on the Website by selecting options from Defendant's drop-down menu on the Website while in California, and whose electronic communications were intercepted or recorded by Meta, Google, Wingify, and

---

[5] Anne Reinhardt, and Sarah Eitze, *Breaking the Endometriosis Silence: A Social Norm Approach to Reducing Menstrual Stigma and Policy Resistance Among Young Adults*, PSYCHOLOGY & HEALTH, 40(6), 881–903 (2023), https://doi.org/10.1080/08870446.2023.2277838.

SnapChat.  Defendant has enabled these Third Parties to intercept visitors' communications by employing these Third Parties' services to track users across the Website.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

7.      The Court has general personal jurisdiction over Defendant because O Positiv's principal place of business is in Los Angeles in the State of California, meaning Defendant is at home in this forum.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in California, and the Northern District of California is a judicial district within that state.

## THE PARTIES

***Plaintiff Jane Doe 1***

9.      Plaintiff Jane Doe 1 is an adult citizen of the state of California and resides in Martinez, California.

10.     In or around March of 2025, Plaintiff Jane Doe 1 visited Defendant's Website while in California.  On the Website, Plaintiff communicated with Defendant by selecting "FLO Period & Hormones" from the initial drop-down menu and next selecting "Endocrine Superfood" from the sub-drop-down menu, indicating to Defendant that she wished to view the Endocrine Superfood products.  Plaintiff next selected and purchased three FLO Endocrine Superfood Powder products for purchase.  Plaintiff Jane Doe 1's communications with Defendant – including the categories she selected from the Website's drop-down menu – were intercepted in transit by the Third Parties as enabled by Defendant.  Neither Defendant nor the Third Parties procured Plaintiff Jane Doe 1's prior consent to this interception on the Website.  Plaintiff Doe 1 did not discover and could not have discovered this violation until her retention of counsel.

11.    These communications relate to Plaintiff Doe 1's hormones and menstrual cycle[6] and are thus sensitive communications related to her sexual and reproductive health.  Nevertheless, Defendant allowed the Third Parties to intercept these protected communications.

12.    Pursuant to the systematic process described herein, Defendant assisted third parties, including Meta, Google, Wingify, and SnapChat with intercepting Plaintiff Doe 1's communications, including those that contained confidential information.  Defendant assisted these interceptions without Plaintiff Doe 1's knowledge, consent, or express written authorization.

13.    Plaintiff Jane Doe 1 has, accordingly, had her privacy invaded and has been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

14.    Plaintiff Jane Doe 1 values her reproductive privacy and wishes to proceed with this case anonymously.  She fears that the public disclosure of her identity will subject her to harassment, ridicule, embarrassment, and potential retaliation and stigma.

***Plaintiff Jane Doe 2***

15.    Plaintiff Jane Doe 2 is an adult citizen of the state of California and resides in Mill Valley, California.

16.    In or around July of 2025, Plaintiff Jane Doe 2 visited Defendant's Website while in California.  On the Website, Plaintiff communicated with Defendant by selecting the "FLO Period & Hormones" from the initial drop-down menu and next selecting "Hormonal Acne" and "Endocrine Superfood" from the sub-drop-down menu, indicating to Defendant that she wished to view the Hormonal Acne and Endocrine Superfood products for purchase.  Plaintiff next selected and purchased the FLO-PMS Vitamin Capsules.  Plaintiff Doe 2's communications with Defendant – including the drop-down categories she selected from the Website's drop-down menu —  were intercepted in transit by the Third Parties as enabled by Defendant.  Neither Defendant nor the Third Parties procured Plaintiff Doe 2's prior consent to this interception on the Website.  Plaintiff Doe 2 did not discover and could not have discovered this violation until her retention of counsel.

---

[6] O POSITIV, *Women's Endocrine Superfood Powder*, https://opositiv.com/products/flo-endocrine-superfood-powder#anchor--product-title.  Defendant describes the product as aiding in "Hormone Balance" and is for people with "unpredictable periods."

17.     These communications relate to Plaintiff Doe 2's hormones, menstrual cycle, and PMS and are thus sensitive communications related to her sexual and reproductive health. Nevertheless, Defendant allowed the Third Parties to intercept these protected communications.

18.     Pursuant to the systematic process described herein, Defendant assisted third parties, including Meta, Google, Wingify and SnapChat, with intercepting Plaintiff Doe 2's communications, including those that contained confidential medical information.  Defendant assisted these interceptions without Plaintiff Doe 2's knowledge, consent, or express written authorization.

19.     Plaintiff Jane Doe 2 has, accordingly, had her privacy invaded and has been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

20.     Plaintiff Jane Doe 2 values her reproductive privacy and wishes to proceed with this case anonymously.  She fears that the public disclosure of her identity will subject her to harassment, ridicule, embarrassment, and potential retaliation and stigma.

***Defendant***

21.     Defendant, O Positiv, Inc., is a Delaware corporation with its principal place of business in Los Angeles, California.[7]

22.     O Positiv has "an extensive product range dedicated to addressing issues related to vaginal, digestive, urinary, menstrual, and menopausal health" which are available on its Website and in Target stores.[8]  It boasts that it is "the leading brand in women's hormonal health and makers of the #1 Vaginal Probiotic and #1 Menopause Relief Gummy Supplement in the US."[9]

---

[7] O POSITIV, INC., SEC Form D, https://www.sec.gov/Archives/edgar/data/1805592/000180559220000001/xslFormDX01/primary_doc.xml.

[8] *Leading Women's Wellness Brand O Positiv Launches in Target*, PR NEWSWIRE (Dec. 20, 2023), https://www.prnewswire.com/news-releases/leading-womens-wellness-brand-o-positiv-launches-in-target-302019626.html.

[9] *Leading Women's Health Brand O Positiv Expands Product Assortment in Target Stores and on Target.com*, PR NEWSWIRE (Apr. 15, 2025), https://www.prnewswire.com/news-releases/leading-womens-health--brand-o-positiv-expands-product-assortment-in-target-stores-and-on-targetcom-302427473.html.

1

## FACTUAL ALLEGATIONS

2

**I.    BACKGROUND OF THE CALIFORNIA INFORMATION PRIVACY ACT**

3        23.    The California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*,

4    prohibits aiding or permitting another person to willfully – and without the consent of all parties to

5    a communication – read or learn the contents or meaning of any message, report, or

6    communication while the same is in transit or passing over any wire, line, or cable, or is being sent

7    from or received at any place within California.

8        24.    To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish

9    that the defendant, "by means of any machine, instrument, contrivance, or in any other manner,"

10    does any of the following:

11

12           Intentionally taps, or makes any unauthorized connection, whether
             physically, electrically, acoustically, inductively or otherwise, with
             any telegraph or telephone wire, line, cable, or instrument, including
13           the wire, line, cable, or instrument of any internal telephonic
             communication system,

14
15           Or

16           Willfully and without the consent of all parties to the
             communication, or in any unauthorized manner, reads or attempts to
17           read or learn the contents or meaning of any message, report, or
             communication while the same is in transit or passing over any wire,
18           line or cable or is being sent from or received at any place within
             this state,

19
20           Or

21           Uses, or attempts to use, in any manner, or for any purpose, or to
             communicate in any way, any information so obtained,
22
23           Or

24           Aids, agrees with, employs, or conspires with any person or persons
             to unlawfully do, or permit, or cause to be done any of the acts or
25           things mentioned above in this section.

        25.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new
26
    technologies" such as computers, the internet, and email.  *See Matera v. Google Inc.*, 2016 WL
27
    8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be
28

construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Meta's collection of consumers' internet browsing history).

26.    To establish liability under Cal. Penal Code § 632, a plaintiff needs to show that the defendant:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

27.    Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

## II.    PLAINTIFFS' AND CLASS MEMBERS' COMMUNICATIONS INVOLVE SENSITIVE TOPICS

28.    As described above, O Positiv's business centers on providing women with supplements that support their sexual and reproductive health at every stage of womanhood — such as products for menstruation, menopause, vaginal and gut health, hormones, and pregnancy[10].

29.    Thus, communications Plaintiffs and Class Members have with Defendant via the Website are sensitive communications because they directly relate to women's reproductive and sexual bodily functions.  Further, sexual and reproductive functions are often subjects considered highly personal and can often carry stigma.[11]

30.    Aside from carrying stigma, advertisers can also monetize women's sexual and reproductive health data at the expense of women's privacy.  That is because data about a woman's reproductive and sexual health can be worth a lot of money to advertisers.  For example, "[t]he data of pregnant women is particularly valuable to advertisers: expecting parents are consumers who are

---

[10] *See generally*, O POSITIV, *Shop All*, https://opositiv.com/collections/shop-all.

[11] *Supra* notes 4-6.

likely to change to their purchasing habits . . . ."[12]  Thus, while "an average person's data is worth $0.10" a "pregnant woman's will be $1.50."[13]  Further, the spending habits of a woman will vary based on the menstrual cycle phase they are in.[14]  A study found that women in the luteal phase of their menstrual cycle – the phase in the cycle that "starts after ovulation and ends with the first day of [the] period"[15] – engaged in spending that was "less controlled, more impulsive and more excessive compared to earlier phases of their menstrual cycle.[16]  Specifically, "almost two-thirds of women" in the luteal phase "spen[t] more money than they had intended to and [had] a greater incidence of unplanned spending or purchasing of items on impulse."[17]

31.    Aside from being highly valuable data, consumers' sexual and reproductive health data is also sensitive and warrants protection from use without consumers' consent.  As an example of the sensitivity of this type of data, the California Legislature recently enacted an amendment to its Confidentiality of Medical Information Act ("CMIA").  The recent data privacy law amendments illustrate the importance of safekeeping reproductive and sexual health data.  Seeing the need to provide data privacy protections for California residents that use "digital health products and services that collect and transmit certain health data" "given the increasingly hostile environment around reproductive" healthcare, the California Legislature enacted an amendment to the CMIA to include "'reproductive or sexual health application information' in the definition of 'medical information' and the businesses that offer reproductive or sexual health digital services to

[12] *No Body's Business but Mine: How Menstruation Apps Are Sharing Your Data*, PRIVACY INT'L (2019), https://privacyinternational.org/long-read/3196/no-bodys-business-mine-how-menstruations-apps-are-sharing-your-data.

[13] *Id.*

[14] Karen J. Pine & Ben Fletcher, *Women's spending behaviour is menstrual-cycle sensitive*, 50 Personality and Individual Differences 74, (2011).

[15] All About the Luteal Phase of the Menstrual Cycle, https://www.healthline.com/health/womens-health/luteal-phase#what-happens

[16] *Supra*, note 13.

[17] *Id.*

consumers in the definition of a provider of health care for purposes of the [CMIA]."[18]  The

California Senate Rules Committee Report emphasizes that "'[r]eproductive and sexual health

information is clearly health information, and is particularly sensitive given the criminalization of

almost any form of ending a pregnancy.  Our current data protections do not speak to the sensitivity

of this data.'"[19]

32.     Specifically, the CMIA amendment expanded the definition of medical information

under the statute to include "reproductive or sexual health application information" which includes

"information from which one can infer someone's pregnancy status, menstrual cycle, fertility,

hormone levels, birth control use, sexual activity, or gender identity." *See* Cal. Civ. Code §

56.05(q).

33.     And while the current case does not fall under the protection of the CMIA[20], the

type of communications Defendant enables third parties to intercept here mirrors that which the

CMIA considers confidential medical information.  That is because the products consumers

purchase from the Website are directly related to their menstrual cycle, pregnancy status, fertility,

hormones, and so forth, as considered under the CMIA definition of medical information.  *See* Cal.

Civ. Code § 56.05(q).

34.     Thus, Defendant's violation of Plaintiffs' and Class Members' privacy in enabling

the interception of Plaintiffs' and Class Members' communications was a serious breach of

consumers' trust and privacy.

## III.     AN OVERVIEW OF THE THIRD PARTIES' TRACKING TOOLS.

35.     Defendant has purposefully installed Meta, Google, Wingify and SnapChat's

tracking tools on its Website.  Therefore, Defendant has enabled these Third Parties to intercept

---

[18] CALIFORNIA COMMITTEE REPORT, CONFIDENTIALITY OF MEDICAL INFORMATION ACT:
REPRODUCTIVE OR SEXUAL HEALTH APPLICATION INFORMATION, 2023 California Assembly Bill
No. 254, California 2023-2024 Regular Session.
[19] *Id.* (emphasis added).

[20] The current action does not fall under the protection of the CMIA given the type of website
Defendant operates, among other factors.  However, as described above, the type communications
intercepted here mirror what the CMIA considers medical information and is thus highly
confidential.

---

Plaintiffs' and Class Members' communications by employing the Third Parties' tracking tools on its Website in the manner described throughout this Complaint.

     **A.**      **THE FACEBOOK TRACKING PIXEL**

     36.     Facebook, owned by Meta, describes itself as a "real identity platform,"[21] meaning users are allowed only one account and must share "the name they go by in everyday life."[22]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[23]

     37.     Meta sells advertising space by highlighting its ability to target users.[24]  Meta can target users so effectively because it surveils user activity both on and off its site.[25]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[26]  Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[27]

     38.     Advertisers can also build "Custom Audiences."[28]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're

---

[21] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?gaa_at=eafs&gaa_n=ASWzDAgBv80qmBk-eG84pjjaXQ_mKin6qQt2xKdYqf7uQnwVhlfB1FJcBH2IlXX7L8Q%3D&gaa_ts=688a0799&gaa_sig=jHy6omcjq_GiHNtDoU8ZxHL8K22doiw4-dodRtswq4rYDH1pK9mDK0B06csW-y2S7xLvXHKhIeRggAdBGESBzQ%3D%3D.

[22] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[23] META, SIGN UP, https://www.facebook.com/.

[24] META, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[25] META, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[26] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[27] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[28] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

---

loyal customers or people who have used [their] app or visited [their] website."[29]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[30]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[31]

39.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[32]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

40.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[33]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose,

---

[29] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[30] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[31] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[32] META, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[33] See META, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

including what content a visitor views or purchases.[34]  Advertisers can even create their own tracking parameters by building a "custom event."[35]

41.     A popular Business Tool is the Meta Pixel (the "Meta Pixel").  Meta offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Meta Pixel "tracks the people and type of actions they take."[36]  When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

42.     Each time Defendant sent this activity data, it also disclosed a user's personally identifiable information, including their Facebook ID ("FID").  An FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

43.     A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Meta, which contained that user's unencrypted Facebook ID.

---

[34] META, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[35] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[36] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

44.     What is more, when a user checks out on the Website, Meta is sent the email address used to check out.  The email address is encrypted by way of a process known as SHA256, which is a way to "hash" written words in a series of random numbers.

45.     The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user.  Though the "hashing" would prevent a party that is not Meta from obtaining the subscriber's email address, Meta, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to the profile of Facebook users.  The data transmission described herein occurs concurrently with each user's activity, enabling Meta to intercept sensitive data as it is generated.  In other words, Meta's interception of users' communications on the Website occurs "in transit."

46.     When integrated and embedded into a website, the Meta Pixel is not akin to a tape recorder or a "tool" used by one party to record the other.  Instead, the Meta Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Meta Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Meta itself is collecting the content of any conversation.  That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

47.     Once Meta intercepts website communications, it has the capability to use such information for its own independent purposes.  In 2021, Meta generated over $117 billion in revenue.[37]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[38] Meta sells advertising space by highlighting its ability to

---

[37] META, META ANNUAL REPORT 2021,
https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[38] *Id.* at 63.

1    target users by including them in the Core Audiences and Custom Audiences offered to its

2    clients.[39]

3        48.    In practice, this means the information collected is used to (i) analyze trends in

4    consumer behavior based on data collected from websites across the internet that Meta can then use

5    when providing targeted advertising to other companies, (ii) create consumer profiles of specific

6    users, allowing Meta to sell future customers targeted advertising to consumers with specific

7    profile characteristics, and (iii) develop new Meta Business Tools products and services, or

8    improve pre-existing Meta Business Tools products and services.

9        49.    Meta's own documentation makes clear just how much tracking of private

10    information the Meta Pixel does.  It describes the Meta Pixel as code that Facebook's business

11    customers can put on their website to "[m]ake sure your ads are shown to the right people.  *Find …*

12    *people who have visited a specific page or taken a desired action on your website*." (Emphasis

13    added.)[40]

14        50.    Meta instructs such business customers that:

15            Once you've set up the [Facebook Tracking] Pixel, *the pixel will log*
16            *when someone takes an action on your website*.  Examples of
            actions include adding an item to their shopping cart or making a
17            purchase.  *The Pixel receives these actions, or events*, which you
            can view on your [Facebook Tracking] Pixel page in Events
18            Manager.  From there, you'll be able to see the actions that your
            customers take.  *You'll also have options to reach those customers*
19            *again through future Meta ads*.[41]

20        51.    Of course, in women's healthcare, it is O Positiv's "OBGYN-recommended

21    products" which are designed to address women's health concerns related to their menstrual cycles,

22    menopause, and overall vaginal health that gets "add[ed] … to their shopping cart."[42]  In fact, O

23

24    _____

    [39] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES,
25    https://www.facebook.com/business/help/205029060038706.

    [40] META, ABOUT META PIXEL,
26    https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

27    [41] *Id.* (Emphasis added.)

    [42] *Id.*
28

_____

Positiv "work[s] with a diverse team of esteemed doctors who specialize in women's health & hormones" and "[t]ogether, [they] create products with high-quality ingredients that effectively address the root cause" of medical conditions "to help [women] feel better long term."[43]

52.    The Meta Pixel code enables Meta not only to help Defendant with advertising to its own users outside the Website but also includes users among groups targeted by *other* Facebook advertisers relating to the sexual and reproductive health products about which Defendant's users communicated on Defendant's Website.

53.    Meta's Business Help Center explains:

> Meta **uses marketing data to show ads to people who are likely to be interested in them**.  One type of marketing data is website events, which are **actions that people take on your website**.[44]

54.    In other words, Meta sells advertising space by highlighting its ability to target users.[45]  Meta can target users so effectively because it surveils user activity both on and off its site.[46]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[47]

55.    An example illustrates how the Meta Pixel works.  Take an individual who visits Defendant's Website and clicks on the link for "Vaginal & Gut Health" under the "Shop by Category" drop-down menu.  When that "Vaginal & Gut Health" link is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because O Positiv utilizes the Meta Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is

---

[43] O POSITIV, MEET OUR MEDICAL ADVISORY BOARD, *Meet Our Medical Advisory Board*, https://opositiv.com/pages/medical-board.

[44] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[45] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

[46] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[47] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

happening. Meta causes the browser to secretly, simultaneously, and contemporaneously duplicate the communication with O Positiv, transmitting it to Meta's servers, alongside additional information that transcribes the communication's content and the individual's identity.

56.    After collecting and intercepting the information described in the preceding paragraph, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

### B.    GOOGLE ANALYTICS PIXEL

57.    Google offers a range of advertising software, one of which is called Google Analytics. "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[48]

58.    This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item ... by tracking whether they made it to the purchase-confirmation page."[49]

59.    Google advertises this service can "[m]onitor activity on your site as it happens."[50]

60.    Google's business model involves entering voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

61.    Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered onto websites via website features like search bars or drop-down menus.

---

[48] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl =en&ref_topic=14089939&sjid=2827624563183915220-NC.

[49] *Id.*

[50] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

62.    Specifically, "[a]mong other pieces of information, Google Analytics sends the page URL and page title to Google in an AJAX request … an AJAX request provides more information than would be sent by loading a third-party resource only."[51]

63.    An example illustrates how Google Analytics works.  Take an individual who visits Defendant's Website and clicks on the link for "Vaginal & Gut Health" under the "Shop by Category" drop-down menu.  When that "Vaginal & Gut Health" link is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because O Positiv utilizes Google Analytics, Google's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Google causes the browser to secretly, simultaneously, and contemporaneously duplicate the communication with O Positiv, transmitting it to Google's servers, alongside additional information that transcribes the communication's content and the individual's identity.

64.    That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).  Upon information and belief, to analyze the intercepted communications, Google views the intercepted communications.  As such, on information and belief, Google viewed Plaintiffs and Class Members' communications with Defendant to provide advertising services to Defendant.  The data transmission described herein occurs concurrently with each user's activity, enabling Google to intercept sensitive data as it is generated.  In other words, Google's interception of users' communications on the Website occurs "in transit."

65.    When integrated and embedded into a website, Google's Analytics Pixel is not akin to a tape recorder or a "tool" used by one party to record the other.  Instead, the Google Analytics Pixel involves Google, a separate and distinct third-party entity from the parties in the conversation, using the Google Analytics Pixel to eavesdrop on, record, extract information from,

---

[51] Mingjia Huo, Maxwell Bland & Kirill Levchenko, *All Eyes On Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, (2022) ACM 197, 202, https://dl.acm.org/doi/abs/10.1145/3559613.3563190.

and analyze a conversation to which it is not a party.  This is so because Google itself is collecting the content of any conversation.  That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

66.    Once Google intercepts website communications, it has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[52]

67.    Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

68.    Google achieves this targeted advertising by collecting certain data from users while they navigate a website that utilizes Google Analytics, such as Defendant's Website. For example, through the Website which hosts the Google Analytics code, Google Analytics places the _ga cookie on a user's browser. Google and its clients, such as Defendant, use the _ga cookie to "distinguish unique users."[53] In other words, the _ga cookie will identify users and associate actions a person takes on a website to them.

69.    But beyond the use of cookies, like _ga, to identify individuals and attribute their online actions to them, Google also engages in browser fingerprinting to personally identify individuals.

70.    "Browser fingerprinting is the process of quietly analyzing the unique configuration of a user's web browser when it connects to a website. This fingerprint goes beyond the browser itself, it includes details such as installed languages, operating system, plugins, and time zone,

---

[52] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.
[53] GOOGLE, *[GA4] Cookie usage on websites*, https://support.google.com/analytics/answer/11397207?hl=en

among others. Combined, these attributes form a highly (though not perfectly) unique identifier that helps verify returning users[.]"[54] Since "[e]ach user's software and hardware setup is unique …, this configuration acts like a digital ID that helps verify returning users. Once you have identified the user, you can track their movements across [a] site."[55]

71.    In an effort to transition away from the use of cookies, but maintain ad targeting capabilities in an "ad-supported internet[,] … Google has introduced digital fingerprinting."[56] "[O]rganizations that use [Google's] advertising products can use fingerprinting techniques[.]"[57]

72.    What Google's shift means for internet users, such as users visiting Defendant's Website, is that "advertisers can now use digital fingerprinting techniques with fewer restrictions [as compared to cookies], allowing them to build richer, more detailed profiles of users across multiple platforms. No cookies required."[58]

73.    Google's browser fingerprinting aids with targeted advertising by allowing advertisers to "create hyper-specific audience segments based on everything from device specifications to browsing behavior. This leads to higher conversion rates."[59]

74.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market its advertising capabilities to future clients. Google's ability to personally identify users, leads to "[m]ore precise targeting [and] equals better ROI for advertisers, which translates into increased revenue for Google."[60]

---

[54] Marco Crispin, *What is Browser Fingerprinting & How Does It Work?*, https://seon.io/resources/browser-fingerprinting/.

[55] *Id.*

[56] Pieter Arntz, *Google now allows digital fingerprinting of its users,* https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users.

[57] *Id.*

[58] Atomic Mail, *How Google Tracks You? Digital Fingerprinting Update in 2025*, https://atomicmail.io/blog/how-google-tracks-you-using-digital-fingerprinting.

[59] *Id.*

[60] *Id.*

75.    Google views the contents of the communications it intercepts to engage in its analyzation of the data.  Google states that once the Google Analytics code on a website "collects data, it packages that information up and sends it to Google Analytics to be processed into reports. When Analytics processes data, it aggregates and organizes the data based on particular criteria."[61]

76.    In sum, Google has the capability to use the communications it intercepts for its own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new Google for Business and Google Analytics products and services; and (iii) analyzing website visitors' communications to assist with data analytics and targeted advertising.

**C.    WINGIFY'S VWO SOFTWARE**

77.    Wingify is a marketing platform company that provides website owners with various solutions, through its product VWO or Visual Website Optimizer, such as website visitor personalization and behavior analytics.

78.    Wingify's services operate on a website by having the website owner install Wingify's JavaScript code snippet onto its website.[62]

79.    To provide website personalization, Wingify compiles and uses data of website visitors' behavior on a website to "craft and release personalized experiences for them."[63]  Website visitors' behavioral data includes "website engagement or browsing behavior data" that is captured and collected "[a]s visitors navigate through your site … in the form of events."[64]  Each user experience that Wingify creates using the users' behavioral data, known as an "experience campaign," is triggered based on "visitors' persona or events like when one refreshes a page, when they've scrolled a certain depth, to the time they've spent on a page, among others."[65]

---

[61] GOOGLE, *How Google Analytics Works*, https://support.google.com/analytics/answer/12159447?hl=en#.

[62] VWO, *Before You Get Started With VWO,* https://help.vwo.com/hc/en-us/articles/360019588853-Before-you-get-started-with-VWO.

[63] VWO, *Personalization*, https://vwo.com/personalization/.

[64] *Id.*

[65] *Id.*

80.     Website owners can also create audience segments based on the data collected to then prompt those segments or "personas" with "particular experiences to build personalized journeys."[66]

81.     Wingify's visitor behavior analysis service involves six different "features" to help its customers "conduct a 360-degree qualitative analysis for endless optimization ideas."[67]  Some of those features include session replay services, heatmaps, and user segments.[68]

82.     Wingify's session replay software allows Wingify's consumers to "record [their] visitor interactions with [their] website and replay them in a form of a video.  These recordings show how users interact with [their] website, by capturing their mouse movements, scrolls, and clicks."[69]

83.     Website owners, such as Defendant, can then analyze the session recordings to "[d]ecipher user engagement patterns" or review the generated "event list" cataloging users' actions on the website based on specific events.[70]

84.     Because Wingify's session replay captures all user behavior on a website, Wingify allows its customers to "[e]nable safety" features that "[a]utomatically hide personal identifiable info."[71]  Even so, Defendant did not enable this feature given that Wingify is able to intercept Defendant's users' communications as shown below.

85.     Wingify's business model involves entering voluntary partnerships with various companies and surveilling communications on its partners' websites with its software.

86.     Thus, through websites that employ Wingify's services, such as Defendant's Website, Wingify directly receives the recording of each website visit, including electronic

---

[66] *Id.*

[67] VWO, *Behavior Analytics*, https://vwo.com/insights/.

[68] *Id.*

[69] Vaibhav Singh, *What are Session Recordings in VWO?*, VWO, https://help.vwo.com/hc/en-us/articles/360019732913-What-are-Session-Recordings-in-VWO.

[70] VWO, *Session Recordings*, https://vwo.com/insights/session-recordings/.

[71] *Id.*

communications of website visitors that were entered into search bars, or selected from drop-down menus, in real time.

87.    Because Defendant utilizes Wingify's service, Wingify's embedded JavaScript code operates within users' browsers, tracking the users' interactions (e.g., clicks, scrolls, typing, and other input data) on the Website within which the code is embedded without the users' knowledge and transmitting the information to Wingify's servers.  In this manner, Wingify effectively obtains a recorded replay of the users' experiences on the site.  The data transmission described herein occurs concurrently with each user's activity, enabling Wingify to intercept sensitive data as it is generated.  In other words, Wingify's interception of users' communications on the Website occurs "in transit."

88.    When integrated and embedded into a website, Wingify's software is not akin to a tape recorder or a "tool" used by one party to simply record the other.  Instead, it involves Wingify, a separate and distinct third-party entity from the parties in the conversation, using software to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is because Wingify itself is collecting the content of any conversation.  That information is then analyzed by Wingify before being provided to any entity that was a party to the conversation (like Defendant).

89.    Because Wingify analyzes data it intercepts from its customers' website to provide its customers with behavioral analytics, Wingify views the communications it intercepts.  For example, as part of its behavioral analytics service, Wingify facilitates the creation of segments for data analysis.  This includes using "segmentation parameters such as query parameters"[72] which will include search parameters if the website, such as Defendant's Website, includes information about the items a consumer is searching for (via the drop-down menu in this case) in the URLs as a query parameter.

---

[72] VWO, https://vwo.com/insights/funnels/.

90.     Wingify's services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising, product optimization, and ultimately, monetization.

91.     Information from websites, like Defendant's Website, is central to Wingify's ability to successfully market their advertising capabilities to future clients.

92.     Wingify states in its Privacy Policy that it "may share aggregated and /or anonymized information regarding … usage of the Service(s) with third parties to help us develop and improve the Services and provide our customers with more relevant content and service offering as detailed in our Customer agreements."[73]  Wingify also uses personal information it collects "for other research and analytical purposes" in order "to develop and grow our business and services and promote VWO."[74]

93.     In sum, Wingify has the capability to use the communications it intercepts for its own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new products and services; and (iii) analyzing website visitors' communications to assist with research, growing its business and services, promoting VWO, as well as data analytics and targeted advertising.

**D.     THE SNAP PIXEL**

94.     Snapchat offers businesses like Defendant a tool called the "Snap Pixel," which helps businesses measure "ad results, reach new audiences, and optimize for key actions."[75]

95.     The Snap Pixel can be plugged into any website, as the pixel is "a piece of JavaScript code" that's installed on a website and once "[a business] place[s] a piece of JavaScript code within [their] website [it] tracks the actions Snapchatters take while browsing your site."[76]

---

[73] VWO PRIVACY POLICY, https://vwo.com/privacy-policy/.

[74] Id.

[75] SNAPCHAT, Snap Pixel: Power Your Ad Performance, https://forbusiness.snapchat.com/advertising/snap-pixel#:~:text=What%20is%20the%20Snap%20Pixel,related%20or%20other%20sensitive%20data.

[76] SNAPCHAT, Using The Snap Pixel, (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it.

96.    The Snap Pixel is part of a line of prebuilt software tools under Snapchat's "Business" product line.  By employing Snapchat to collect user information through the Snap Pixel, websites that procure Snapchat's services can use the information to deliver personalized advertisements, increasing revenue for the websites.

97.    When users interact with a webpage with the Snap Pixel installed, the Snap Pixel tracks a variety of actions on a website, like Defendant's, "such as page views [*i.e.*, the URLs of webpages visited by users], purchases [like add-to-cart actions], or sign-ups" as well as other "events," such as selections from drop-down menus.[77]  The information is sent automatically to Snapchat.

98.    SnapChat boasts that "[a]s the [Snap] Pixel measures more conversion events, Snapchat learns more about the types of people in [the business's] audience who are most likely to take similar actions, greatly improving [the business's] ability to unlock conversion optimization for [their] campaigns.  [They] can also create a type of Custom Audience called a Lookalike Audience, which seeks out people who are similar to the people in an existing Custom Audience. That's a great way to help [businesses like Defendant] find new customers who are similar to [their] best customers."[78]

99.    The Snapchat advertising business model involves entering voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

100.    Thus, through websites that procure Snapchat's services, Snapchat directly receives the electronic communications of website visitors that are entered into search bars or selected from drop-down menus in real time.  In other words, SnapChat's interception of users' communications on the Website occurs "in transit."

---

[77] SPRINKLR, *Snapchat Ads Pixels*, https://www.sprinklr.com/help/articles/advanced-snapchat-capabilities/snapchat-ads-pixels/645505f3f65d86626c82ba24.

[78] SNAPCHAT, *Using The Snap Pixel*, (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it.

101.    When integrated and embedded into a website, SnapChat's Snap Pixel is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the conversation, using the Snap Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Snapchat itself is collecting the content of any conversation. That information is then analyzed by Snapchat before being provided to any entity that was a party to the conversation (like Defendant).

102.    In addition to helping companies like Defendant make better use of their own customer information, Snapchat aggregates that information with the information collected from all sites containing the Snap Pixel to track users across multiple websites and platforms, which increases the value of Snapchat's advertising services when they are offered to other companies.

103.    SnapChat's services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising, product optimization, and ultimately, monetization.

104.    Information from websites, like Defendant's Website, is central to SnapChat's ability to successfully market their advertising capabilities to future clients.

105.    SnapChat admits that it uses the personal information it collects to "[d]evelop and improve our features and Services, including algorithms and machine learning models, including for personalization, advertising, augmented reality, safety and security, fairness and inclusivity, and to prevent abuse or other Terms of Services violations."[79]

106.    In sum, SnapChat has the capability to use the communications it intercepts for its own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services including its algorithms and machine learning models; (ii) developing new products and services; and (iii) analyzing website visitors' communications to assist with data analytics and targeted advertising.

[79] SNAPCHAT SUPPORT, LEARN ABOUT HOW SNAP USES DATA,

1

2

## II.    DEFENDANT ENABLES THE THIRD PARTIES' INTERCEPTION OF ITS WEBSITE USERS' COMMUNICATIONS.

107.    O Positiv has knowingly chosen to implement Meta, Google, Wingify, and SnapChat's tracking technologies on its Website and has enabled these Third Parties intercept Plaintiff's and Class Members' communications with Defendant on the Website as detailed herein. Specifically, Defendant's Website does not include a search bar for consumers to type in searches for products.  Instead, Defendant provides consumers with drop-down menus with categories of products from which they may select the product category they wish to browse.  *See* Figure 1. Thus, shoppers can select product categories from the Website's drop-down menus which include categories like URO-Vaginal & Gut Health; FLO-Period & Hormones; MENO-Healthy Aging; and PREGGO-Nutrition & Support.  *See* Figure 1.

**Figure 1**



108.    Once a consumer selections one of the general product categories shown above in Figure 1, each category has a sub-drop-down menu with additional, and more narrow product category selections.  For example, Figure 2 below shows the sub-drop-down menu Defendant provides for consumers who chose the FLO-Period & Hormones category in the first menu.

**Figure 2**



109.    Defendant, through the use of the Third Parties' tracking technologies, enables the Third Parties to intercept the menu categories consumers select from the Website's drop-down menus.  These communications are intercepted as events and include the names of the product categories, which reveal sensitive information about the products consumers are browsing for their sexual and reproductive health.

**A.     DEFENDANT ENABLES META, THROUGH THE META PIXEL, TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT.**

110.    Defendant has integrated the Meta Pixel into its Website.  By integrating the Meta Pixel into its Website code, Defendant has enabled Meta to intercept Defendant's Website users' communications with Defendant as they request to view specific categories of sensitive products via Defendant's drop-down menus.

111.    Through the Meta Pixel, Defendant enables Meta to intercept users' communications with Defendant without users' consent.  When a user selects a category or product from the drop-down menu on Defendant's Website, communicating with Defendant that they are interested in a particular product, because Defendant installed the Meta Pixel on its Website, Meta collects the URL for the page the user is accessing from the Website and therefore also intercepts the drop-down menu terms the user selected – which are in the URL.

112.    For example, when a user clicks on or selects "FLO Period & Hormones" from the drop-down menu on the Website, the Meta Pixel intercepts this communication by collecting the URL of the web page which includes the exact drop-down menu terms the user communicated to Defendant.  *See* Figure 3.

**Figure 3**



113.    Further, when a Website user decides to purchase an item (*see* "ADD TO CART" below in the green box), Meta will know the name of the exact item the user added to their cart.

As seen in Figure 4, when a Website user adds the "Women's Endocrine Superfood Powder for Gut Health" item to their shopping cart, Meta intercepts that information.  *See* Figure 4.

**Figure 4**



B.    **DEFENDANT ENABLES GOOGLE, THROUGH GOOGLE ANALYTICS, TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT.**

114.    Defendant has integrated the Google Analytics Pixel into its Website.  By integrating the Google Analytics Pixel into its Website code, Defendant has enabled Google to intercept Defendant's Website users' communications with Defendant as they request to view specific categories of sensitive products via Defendant's drop-down menus.

115.    Through the Google Analytics Pixel, Defendant enables Google to intercept users' communications with Defendant without users' consent.  When a user selects a category or product from the drop-down menu on Defendant's Website, communicating with Defendant that they are

interested in a particular product, because Defendant installed Google Analytics on its Website, the Google Analytics Pixel collects the URL for the page the user is accessing from the Website and therefore also intercepts the drop-down menu terms the user selected – which are in the URL.

116.    For example, when a user selects "Hormonal Acne Vitamin Capsules" from the sub-drop-down menu under the FLO Period & Hormones category, Google Analytics intercepts this communication by collecting the URL of the web page which includes the which includes the exact drop-down menu terms the user communicated to Defendant.  Further, when a Website user decides to purchase an item (*see* "purchase" in green box below), Google will know the name of the exact item added to the user's cart.  As seen in Figure 5, when a Website user adds the "FLO-Acne Vitamin Capsules" item to their cart, Google obtains that information.  *See* Figure 5.

**Figure 5**



### C. DEFENDANT ENABLES WINGIFY, THROUGH ITS VWO SOFTWARE, TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT

117.    Defendant has integrated Wingify's VWO (Visual Website Optimizer) code into its Website.  By doing so, Defendant has enabled Wingify to intercept Defendant's Website users' communications with Defendant as they request to view specific categories of sensitive products via Defendant's drop-down menus.

118.    Through Wingify's code, Defendant enables Wingify to intercept users' communications with Defendant without users' consent.  When a user selects a category from the drop-down menu of Defendant's Website, communicating with Defendant that they are interested in a particular product, because Defendant installed Wingify's code on its Website, Wingify collects the URL for the page the user is accessing from the Website and therefore also intercepts the drop-down menu terms the user selected – which are in the URL.

119.    For example, when a user selects "Endocrine Superfood" from the sub-drop-down menu under the FLO Period & Hormones category, Wingify intercepts this communication by collecting the URL of the web page which includes the exact drop-down menu terms the user communicated to Defendant.  *See* Figure 6.

**Figure 6**



120.    Further, when a Website user decides to purchase an item (*see* "gtm.add-to-cart" in the green box below), Wingify will know the name of the exact item added to the user's cart.  As seen in Figure 6, when a Website user adds the "Women's Endocrine Superfood Powder" item to their cart, Wingify obtains that information.  *See* Figure 7.

**Figure 7**



###    D.    DEFENDANT ENABLES SNAPCHAT, THROUGH ITS SNAPCHAT PIXEL, TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT

121.    Defendant has integrated SnapChat's Pixel Code into its Website.  By doing so, Defendant has enabled SnapChat to intercept Defendant's Website users' communications with Defendant as they request to view specific categories of sensitive products via Defendant's drop-down menus.

122.    Through Snapchat's code, Defendant enables SnapChat to intercept users' communications with Defendant without users' consent.  When a user selects or clicks on a category from the drop-down menu on Defendant's Website, communicating with Defendant that

they are interested in a particular product, because Defendant installed SnapChat's code on its

Website, Snapchat collects the URL for the page the user is accessing from the Website and

therefore also intercepts the exact terms the user clicked onto on the Website's drop-down menu –

which are in the URL.

123.   For example, when a user selects "PMS Vitamin Capsule" under the FLO Period &

Hormones drop-down category on the Website, SnapChat intercepts this communication by

collecting the URL of the web page which includes the exact terms the user communicated to

Defendant.  *See* Figure 8.

**Figure 8**



1

2

### III.    CATEGORIES FROM THE DROP-DOWN MENUS AND ITEMS ADDED TO SHOPPING CARTS ON THE WEBSITE ARE COMMUNICATIONS.

3

124.    Defendant's Website does not include a search bar for consumers to type in searches

4

for products.  Instead, Defendant provides consumers with drop-down menus with categories of

5

products from which they may select to browse for products.  Thus, while a typical website that

6

does include a search bar, consumers are able to communicate to the Website owner by typing text

7

into the search bar related to the products they wish to browse, here, consumers must utilize the

8

Website's drop-down menus to carry out these communications.

9

125.    Accordingly, selections that users make from the Website's drop-down menus,

10

buttons or products they click, and items they add to a shopping cart on Defendant's Website are

11

communications and are a product of users affirmatively entering, and interacting with, information

12

on the Website (*i.e.*, the confidential communications are not procedurally or automatically

13

generated).

14

126.    The names of the categories of products users select from the drop-down menus and

15

the names of products users add to their shopping carts are personal information because they

16

"divulge a user's personal interests, queries, and habits."  *See In re Facebook, Inc. Internet Tracking*

17

*Litigation*, 956 F.3d 589, 605 (9th Cir. 2020).  This is especially true in the context of Defendant's

18

Website given the sensitive nature of the products Defendant sells, as described throughout this

19

complaint.

20

21

### IV.    DEFENDANT NEVER RECEIVED USERS' CONSENT TO EMPLOY THE THIRD PARTIES' TRACKING TOOLS TO INTERCEPT USERS' COMMUNICATIONS.

22

127.    Defendant allows the Third Parties to intercept users' confidential communications

23

without obtaining users' consent.

24

128.    At no point during a person's use of the Website does Defendant inform users that

25

Defendant enables third parties to intercept users' communications with Defendant.

26

27

28

129.    When a user searches for products via their selections from the drop-down menus or adds products to their shopping carts, Defendant does not provide users with any type of notice about its practice of allowing third parties to intercept user communications with Defendant.

130.    Thus, Defendant never properly obtains consent from its users to disclose their communications from the Website.

## CLASS ACTION ALLEGATIONS

131.    Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as all persons in the United States who, during the Class Period, visited Defendant's Website, https://opositiv.com/, and clicked on options from the drop-down menu and/or added products to their shopping carts (the "Class" or "Nationwide Class").

132.    Plaintiffs also seek to represent a subclass consisting of all California residents who, during the Class Period, visited Defendant's Website, https://opositiv.com/, and clicked on options from the drop-down menu and/or added products to their shopping carts (the "California Subclass" or "Subclass").

133.    Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

134.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

135.    Excluded from the Class and Subclass is O Positiv; any affiliate, parent, or subsidiary of O Positiv; any entity in which O Positiv has a controlling interest; any officer director, or employee of O Positiv; any successor or assign of O Positiv; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

136.    Numerosity/Ascertainability.  Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class

and Subclass Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Class and Subclass.  The identity of such membership is readily ascertainable from O Positiv's records and non-party records, such as those of Facebook, Google, Wingify and SnapChat.

137.    Typicality.  Plaintiffs' claims are typical of the claims of the Class and Subclass because Plaintiffs used the Website and, because of Defendant's unlawful conduct, had their confidential electronic communications intercepted by third parties, such as Meta, Google, Wingify and SnapChat, without their express written authorization or knowledge.  Plaintiffs' claims are based on the same legal theories as the claims of other Class and Subclass Members.

138.    Adequacy.  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass Members.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Class and Subclass.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.  Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass.

139.    Common Questions of Law and Fact Predominate/Well Defined Community of Interest.  Questions of law and fact common to the members of the Class and Subclass predominate over questions that may affect only individual members of the Class and Subclass because Defendant has acted on grounds generally applicable to the Class and Subclass.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Class and Subclass include, but are not limited to, the following: whether Defendant violated CIPA § 631 and/or § 632 and whether Plaintiffs and the proposed Class and Subclass Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

140.    Superiority.  Class action treatment is a superior method for fair and efficient adjudication of the controversy.  Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty that will be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 631
(On Behalf Of The Class and California Subclass)**

141.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of Class Members and California Subclass Members.

142.    CIPA is codified at Cal. Penal Code §§ 630 to 638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications…." Cal. Penal Code § 630.

143.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

144.    CIPA § 631(a) is not limited to phone lines but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

145.    The Third Parties' Tracking Tools are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

146.    The Third Parties, Meta, Google Wingify and SnapChat, are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, Meta, Google Wingify and SnapChat were third parties to any communication between Plaintiffs, Class Members and Subclass Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

147.    At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or

learned the contents or meaning of electronic communications of Plaintiffs, Class Members and Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

148.    At all relevant times, the Third Parties used or attempted to use the communications intercepted by their Tracking Tools to promote and improve their advertising platforms.

149.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiffs, Class Members and Subclass Members using the Tracking Tools and to accomplish the wrongful conduct at issue here.

150.    Plaintiffs, Class Members and Subclass Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs', Class Members' and Subclass Member's electronic communications.  Nor did Plaintiffs, Class Members, or Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

151.    The wiretapping of Plaintiffs, Class Members and Subclass Members occurred in California, where they accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiffs, Class Members' and Subclass Members' electronic communications to their servers.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf Of The Class and California Subclass)**

152.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of Class Members and California Subclass Members.

153.    CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential
> communication, uses an electronic amplifying or recording device
> to eavesdrop upon or record the confidential communication,
> whether the communication is carried on among the parties in the

presence of one another or by means of a telegraph, telephone, or other device, except a radio.

154.     The Third Parties' Tracking Tools are "electronic amplifying or recording device[s]."

155.     At all relevant times, the communications between Plaintiffs, Class Members, and Subclass Members on one hand, and O Positiv on the other, were confidential as they concerned Plaintiffs', Class Members' and Subclass Members' interest or intent to purchase products for their reproductive or sexual health — which is sensitive information.

156.     At all relevant times, Meta, Google, Wingify, and SnapChat intentionally used the Tracking Tools to eavesdrop upon and record such confidential communications.

157.     When communicating with O Positiv, Plaintiffs, Class Members and California Subclass Members had an objectively reasonable expectation of privacy based on the nature of the products they browsed for.  Plaintiffs, Class Members and Subclass Members did not reasonably expect anyone other than O Positiv to be a party to the communications, and did not expect that other, third-party entities, Meta, Google, Wingify, and SnapChat, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

158.     Plaintiffs, Class Members, and Subclass Members did not consent to any of the Third Parties' actions.  Nor have Plaintiffs, Class Members, and Subclass Members consented to the Third Parties' intentional use of an electronic amplifying or record device to eavesdrop upon and record their confidential communications.

159.     Pursuant to Cal. Penal Code § 637.2, Plaintiffs, Class Members and Subclass Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     For an order certifying the putative Class and Subclass, naming Plaintiffs as the representatives of the putative Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class

Members and Subclass Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the putative Class and Subclass on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiffs and the putative Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs, on behalf of themselves and the proposed Class and Subclass, demand a trial by jury for all the claims asserted in this Complaint so triable.

Dated: November 17, 2025                               Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Ines Diaz Villafana*

Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: idiaz@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482,
*Admission Pending*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: mroberts@bursor.com

*Attorneys for Plaintiffs*